IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT P. VILLA,

      Plaintiff,                      No. CIV S-06-0846 GGH

    vs.

MICHAEL J. ASTRUE,[1]
Commissioner of Social
Security,                             ORDER

      Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment or Remand is granted, the Commissioner's Cross Motion for Summary Judgment is denied, and the Clerk is directed to enter judgment for the plaintiff. This case is remanded for an award of benefits.

\\\\\

\\\\\

---

[1] Michael J. Astrue became Commissioner on February 12, 2007. Accordingly, he should be substituted as defendant in this suit. Fed. R. Civ. P. 25(d)(1). No further action need be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

BACKGROUND

Plaintiff, born December 24, 1957, applied for disability benefits on March 2, 2004. (Tr. at 57.) Plaintiff alleged he was unable to work since July 10, 2003, due to HIV (human immunodeficiency virus), Hepatitis C, and depression. (Tr. at 57, 61, 20.) In a decision dated September 20, 2005, ALJ William C. Thompson, Jr. determined that plaintiff was not disabled.[2] The ALJ made the following findings:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

\\\\\

---

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

3. The claimant's hepatitis, human immunodeficiency virus and depression are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. I find that the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to stand and/or walk for six hours in an eight hour workday and sit without limitation when not required to stand or walk. In addition, he is able to lift and carry ten pounds frequently and twenty pounds occasionally but should never climb ladders, ropes or scaffolds. He should avoid exposure to hazards such as unprotected heights or moving machinery. The claimant has a poor ability to interact with the general public and should have restricted contact with the public.

7. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has "a limited education" but is literate (Exhibit 1E, p. 1) (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work pursuant to the testimony of the vocational expert (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using medical-Vocational Rule 202.18 as a framework for decision-making, there is a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an assembler, a light, unskilled job. There are 51,000 such jobs statewide. He could work as a produce inspector, a light, unskilled job. There are 13,000 such jobs statewide. He could also work as a hand packer, a light, unskilled job. There are 20,000 such jobs statewide.

> 13. Even if the claimant's residual functional capacity were assessed to the extent that he could lift only small objects, stand and/or walk for two hours in an eight hour workday and sit for the remainder of the workday and all other limitations were unchanged, using Medical-Vocational Rule 201.19 as a framework for decision-making, there is also a significant number of jobs in the national economy he could perform. Examples of such jobs include work as an assembler, a sedentary, unskilled job. There are 10,000 such jobs statewide. He could still work as a produce inspector, a sedentary, unskilled job. There are 3,000 such jobs statewide. He could also work as a sander/buffer, a sedentary, unskilled job. There are 1,000 such jobs statewide.
>
> 14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. at 26-27.)

ISSUES PRESENTED

Plaintiff has raised the following issues: (A) Whether the ALJ Erred in Rejecting the Opinions of Plaintiff's Treating Physician and Treating Psychiatrist; (B) Whether the ALJ's Credibility Finding is Not Based on Substantial Evidence; and (C) Whether the ALJ Failed to Sustain Her Burden to Establish Other Work in the National Economy.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

4

2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

    A. Whether the ALJ Erred in Rejecting the Opinions of Plaintiff's Treating Physicians

Plaintiff claims that the ALJ erred in rejecting the treating opinions of Dr. Adeyemo,[3] plaintiff's treating psychiatrist, and Dr. Bishop, plaintiff's treating physician.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[4] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported

---

[3] Plaintiff has also referred to this doctor as Dr. Adeyerw.

[4] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[5] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

        In this case, the ALJ gave "significant weight" to two non-examining state agency physicians, and gave "little weight" to the opinions of all treating physicians, including Drs. Bishop, Khambati, and Adeyemo.  Although the ALJ is permitted to rely on the opinions of non-examining professionals, he may do so only where he gives specific and legitimate reasons that are supported by an "abundance of evidence."  Id.  Such evidence might include laboratory test results, contrary reports from examining physicians, plaintiff's testimony which conflicts with a treating physician, higher expertise of non-examining medical advisor, and suspect nature of examining physicians' test results.  Id., citing Andrews, 53 F.3d at 1043.  Further, in Magallanes, 881 F.3d at 753(emphasis added), the court held that where the conflicting non-treating opinion is based on *independent* objective findings, it could constitute substantial evidence.  Most recently, the Ninth Circuit restricted the ALJ further by holding that the opinion of a non-treating physician, when based on the same evidence relied on by the treating physician, but supporting a different conclusion from the treating source, would not be considered substantial evidence.  Orn v. Astrue, ___ F.3d ___, 2007 WL 2034287 (9th Cir. 2007).

---

    [5] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1         Here, the ALJ rejected Dr. Adeyemo, plaintiff's treating psychiatrist, in favor of
2 non-examining physician Dr. Agcaoili's psychiatric review technique form. The ALJ stated that
3 although Adeyemo was plaintiff's treating doctor, he had only treated him for four months. The
4 course of treatment provided was not consistent with a patient who is truly disabled, as this
5 doctor had opined. The ALJ also referred to treatment records which showed that after
6 increasing his medication, plaintiff had improved, thereby failing to support the severity of
7 limitations imposed by this psychiatrist. Consequently, the ALJ gave this doctor little weight.
8 (Tr. at 23.)

9         Dr. Agcaoili's (SSA physician) report, dated August 12, 2004, based on an
10 assessment from July 10, 2003, diagnosed depressive syndrome and found that plaintiff had
11 appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating and
12 hallucinations. He concluded that plaintiff met the listings. (Tr. at 125, 128.) This consultant
13 thought plaintiff was markedly limited in maintaining social functioning, and maintaining
14 concentration, persistence or pace, but predicted that by January, 2005, plaintiff would be only
15 mildly limited in those areas. He added that plaintiff had experienced three episodes of
16 decompensation. (Id. at 135.) The ALJ reasoned that this report was consistent with the weight
17 of the evidence which showed plaintiff's symptoms improved after taking Remeron, and because
18 this consultant was trained and experienced. (Id. at 20.) He also explained that plaintiff's
19 treatment regimen of seeing a psychiatrist every four months was not reflective of a marked
20 degree of impairment. (Id.)

21         Dr. Adeyemo, in contrast, issued a report on December 8, 2004, in which he
22 diagnosed major depression with psychosis. He made clinical findings of depression, anxiety,
23 mood swings, insomnia, nightmares, paranoia, and hallucinations. (Tr. at 187.) He thought
24 plaintiff was having a fair response to Remeron and prognosis was fair. (Id.) He opined that
25 plaintiff had a poor ability to follow work rules, relate to co-workers, deal with the public,
26 interact with supervisors, function independently, maintain attention and concentration,

7

understand, remember and carry out detailed or complex instructions, behave in an emotionally stable manner, and relate predictably in social situations. (Id. at 188-89.)  Plaintiff had a fair ability to use judgment, understand, remember and carry out simple instructions, maintain personal appearance and be reliable.  He had no ability to deal with work stress.  (Id.)

Contrary to the ALJ's opinion that Dr. Adeyemo's treatment was brief, the record indicates that plaintiff had been seen by San Joaquin County Mental Health Services since June 4, 2004, the clinic where Dr. Adeyemo worked.  (Tr. at 172.)  The last record of treatment is dated May 3, 2005, indicating that plaintiff obtained treatment from Dr. Adeyemo's clinic for about eleven months.  (Tr. at 207.)  Although this psychiatrist did not personally see plaintiff until August 16, 2004, plaintiff was regularly visiting the clinic during this entire time period, every one to three months.  (Tr. at 172-74, 207-26, 187-90.)  The ALJ's reason to reject Dr. Adeyemo on this basis is not legitimate.  The records themselves indicate that plaintiff's GAF score on July 21, 2004, was 48,[6] and the plan was to rule out major depression with psychotic features.  (Tr. at 221.)  It is true that this score was assessed at the beginning of plaintiff's treatment; however, plaintiff continued to be seen by this clinic after January, 2005, the date that Dr. Agcioili stated that plaintiff's condition would improve, and it is does not appear that plaintiff did improve.  On March 7, 2005, plaintiff reported that medications were helping but he had increased stressors.  His viral load was detectible at this time.  Plaintiff continued to be diagnosed with major depressive disorder.  (Tr. at 208.)  It is true that plaintiff had improved due to the Remeron; however, even with this improvement, Dr. Adeyemo opined that plaintiff's prognosis was only fair.  At this time, plaintiff was still having nightmares, and was "vaguely guarded but not overtly paranoid."  (Tr. at 210, 187.)  Furthermore, his condition continued to be

---

[6] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, a GAF of 41-50 indicates: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

serious despite the improvement with medication. On May 3, 2005, plaintiff was reported as "quite anxious." The interviewer stated, "quite disabled at this time, and not mentally fit to attend/function in a work environment. ... Episodically thinks about giving up..." Plaintiff was again diagnosed with major depressive disorder. (Tr. at 207.) These notes added that plaintiff's HIV CD4 count had decreased, and his viral load was not detectable. (Id. at 207.)

Additionally, the ALJ's conclusion that psychiatric treatment every four months was not reflective of a marked degree of impairment is based on a faulty assumption. Plaintiff was seen for his mental health problems every one to three months, as noted above. The ALJ completely failed to mention the most recent treating notes from 2005.[7] Moreover, although a physician's opinion on the ultimate issue of disability is not required to be accepted by the ALJ, Murray v. Heckler, 722 F.2d 499 (9th Cir. 1983), it is indicative of the serious nature of the illness. For the ALJ to ignore the most recent psychiatric report from May, 2005, without specifically disregarding it based on legitimate reasons in the record was error.

Additionally, for the ALJ to rely on Dr. Agcioili's opinion, he would have to accept this non-treating physician's prediction of plaintiff's prognosis in the future. The court is not willing to accept such a prediction. This physician's contemporaneous opinion, based on the record, included several marked limitations in functioning, as well as three episodes of decompensation, which the ALJ was bound to accept.

In regard to the ALJ's reliance on a second non-examining SSA doctor over plaintiff's treating physician, Dr. Bishop, the ALJ explained that he gave this doctor's opinion little weight because he had stated that plaintiff was too fatigued to continue working, and he may not have been familiar with the definition of disability in the Social Security Act and regulations. The ALJ explained that Dr. Bishop may have thought plaintiff could not do his past work, in which case it was consistent with the ALJ's opinion; however, the ALJ stated that the

---

[7] Other medical records indicate that plaintiff was actually hospitalized for depression. (Tr. at 194, 196, 172-73.)

9

determination of whether plaintiff could do other work was reserved to him alone. (Tr. at 22.) The ALJ also rejected Dr. Bishop's opinion that plaintiff could only work one to two hours before needing to rest in bed. This doctor had noted that plaintiff had no detectable viral load, had a T-cell count of 313, positive HIV test, rising liver function tests, and ALT of 61. The ALJ thought that Dr. Bishop's treatment was not consistent with someone who is truly disabled. (Tr. at 22.) Furthermore, the ALJ thought the weight of the evidence contradicted Dr. Bishop's limitations which were based solely on plaintiff's subjective complaints. (Id.)

On January 26, 2004, Dr. Bishop thought plaintiff was temporarily disabled from January 29, 2004 to January 29, 2005, and that he should be reevaluated at that time. (Tr. at 144.) On January 26, 2004, Dr. Bishop noted that plaintiff's fatigue had worsened over the last four months. (Tr. at 199.) On March 23, 2004, however, it was noted by Dr. Bishop that plaintiff's fatigue was "uncontrolled probably due to Hep C, HIV, and grueling schedule R/O anemia." (Id. at 198.)

On January 29, 2004, Dr. Bishop noted that plaintiff was "early asymptomatic on TZV (Trizivir) for HIV. Hepatitis C was active per blood and stool tests taken by Dr. Belagorski. (Tr. at 142.)

On April 5, 2004, Dr. Bishop opined that plaintiff was chronically ill and visibly fatigued with Hepatitis C and HIV, that he could occasionally lift and carry 50 pounds, and frequently lift and carry 10 pounds, and stand and walk less than two hours. He did not check any box for the amount of time plaintiff could sit. He added that plaintiff could not work more than one to two hours before needing to rest for 15 to 30 minutes. (Tr. at 92.) Clinical and laboratory findings to support this assessment were an undetectable viral load, a T-cell count of 313, HIV result of 4, rising liver function test, with an ALT of 61. An undetectable viral load indicates a lower risk of disease progression in regard to HIV. www.pdrhealth.com. Dr. Bishop explained that it was undetectable because plaintiff was on medication. (Tr. at 93.) However, a T-cell or CD4 count of between 200 and 500 is symptomatic for HIV. www.pdrhealth.com.

ALT stands for alanine aminotransferase in the blood. It indicates whether liver cell damage was taking place on the day the blood was tested. A normal ALT level is 30 to 40 units per liter. Patients are usually treated if their ALT levels are elevated to twice the normal level. www.hcvadvocate.org.

      A chart showed progression of various lab tests between January, 2002 and March, 2005. CD4 count in 2002 was 344. His CD4 count had gone from 365 in December, 2003 to a high of 503 in July, 2004, and gradual decreases down to 297 in March, 2005, the most recent dated reported.[8] This rise and then gradual drop occurred despite plaintiff's medication which initially worked, but seemed to fail over time. (Id. at 191.) The viral load had decreased from 6823 in 2002 to not detectable on Trizivir. Although the viral load was 52 in December, 2004, it decreased to a non-detectable level in March, 2005. (Id.) Dr. Bishop noted that plaintiff was experiencing mild weight loss, and severe uncontrolled fatigue, probably due to Hepatitis C, HIV and plaintiff's grueling schedule. (Id.)

      On March 29, 2005, Dr. Hartnett found the HIV to be stable, noted that in regard to Hepatitis C, the liver function tests should be checked, and opined that plaintiff's fatigue was "probably due to depression more than medical." (Id.)

      In regard to plaintiff's Hepatitis C, plaintiff testified that he had not been prescribed medication for it yet, and had not undergone a liver biopsy because he could not pay for it. (Tr. at 269-70.) He stated that Dr. Krasner told him that blood samples revealed enzymes in his blood that were positive for Hepatitis C, but that he needed further tests to determine whether there was liver deterioration. (Id. at 264.) These tests were not completed because plaintiff could not afford to follow through with treatment.

      The only doctors upon whom the ALJ relied for residual functional capacity based on his physical limitations were both non-examining state agency doctors. Dr. Gollub on May

---

[8] A CD4 count of less than 200 is indicative of AIDS. www.pdrhealth.com.

17, 2004, found that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could stand or walk six hours in a day, and sit for six hours. (Id. at 161.) Pushing and pulling were unlimited. (Id.) Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 162.) This assessment was affirmed by Dr. Pong. (Id. at 167.) Dr. Gollub's notes in support of his analysis indicate that there was only one medical source listed, that they should try to obtain Dr. Belagorsky's records in regard to hepatitis as it was unclear whether the Hepatitis C was causing the fatigue. (Tr. at 168, 169.)

The one exam that Dr. Belagorsky provided indicated that plaintiff was no longer having diarrhea, although previous notes stated plaintiff was having diarrhea four to six times per day. (Id.) There were no HIV pathogens in the stool, plaintiff's weight was up three pounds, plaintiff had undetectable viral loads while on medication, and he was asymptomatic for HIV. (Id. at 169, 154.) These records do not reflect the decreased CD4 level of May, 2005 which was 297, and is considered "symptomatic." www.pdrhealth.com. In addition to this incorrect and outdated assessment of plaintiff's HIV, the SSA reviewer wrote the question, "Do we need IM CE for addtl info regarding hep C & fatigue?" (Id. at 169.) This question is telling, as is Dr. Gollub's notation that plaintiff's ALT level of 61 was probably slightly high but depended on normals for lab. (Id.) These questions further indicate that the SSA reviewer's assessment does not stand on firm ground, but is supported by uncertainty.

"When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" Orn v. Astrue, ___ F.3d ___, 2007 WL 2034287 (9th Cir. 2007). This rule should hold especially true in this case where the non-examining physician relies on the same clinical findings as the treating physician.

What is more tenuous is the ALJ's reliance on two non-examining SSA physicians (with affirmation by a third non-examining doctor) for the entirety of his opinion, including both the mental and physical aspects of plaintiff's ailments. In fact, the ALJ appears to

12

have relied on no examining physicians in this case. Such opinions cannot be based on substantial evidence where they do not rely on independent clinical findings different from those of the treating physicians. In such a case, the treating physicians' opinions must be credited as a matter of law. Orn, Id. at *14; Lester, 81 F.3d at 830. The opinions of Drs. Adeyemo, Khambati, Hartnett and Bishop, when credited, conclusively establish that plaintiff is disabled.[9]

Therefore, the case will be remanded for an award of benefits. For these reasons, plaintiff's remaining issues will not be addressed.

CONCLUSION

The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990). If additional administrative proceedings would remedy the defects in the decision, remand is appropriate. Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); Barbato v. Commissioner of Social Security Admin., 923 F. Supp. 1273, 1277-78 (C.D.Cal. 1996). The court concludes that little is to be gained from remand. There appears to be no justifiable reason to reject the treating physicians' limitations. Both physicians' opinions must now be credited as a matter of law. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). The record is complete in this regard.

Accordingly, plaintiff's Motion for Judgment for Summary Judgment or Remand is GRANTED, the Commissioner's Cross Motion for Summary Judgment is DENIED, and the

\\\\\
\\\\\

---

[9] Plaintiff does not object to the ALJ's treatment of Dr. Khambati. This treating internist completed a questionnaire regarding plaintiff's ability to work. He opined that plaintiff was precluded from performing full time work at any exertional level, including sedentary, due to pain in the back, left shoulder, and left rib area. (Tr. at 185.) He thought plaintiff could sit for 15 to 30 minutes at a time, stand and walk for 30 minutes, sit for two hours in an eight hour day, and stand or walk for a total of two hours in an eight hour day. He must lie down or elevate his legs for 30 minutes in an eight hour day. He thought that plaintiff had been disabled to this degree since January 29, 2004. (Id.)

13

1  Clerk is directed to enter judgment for the plaintiff. This case is remanded for a computation of
2  benefits only.
3  DATED: 9/10/07                                             /s/ Gregory G. Hollows

4                                                             _____
                                                              GREGORY G. HOLLOWS
                                                              U.S. MAGISTRATE JUDGE
5  GGH/076
   Villa0846.ss.wpd